1

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF IOWA
 2

 3     UNITED STATES OF AMERICA,)
                                )
 4              Plaintiff,      )
                                )
 5       VS.                    )   CR 08-1324
                                )
 6     KARINA PILAR FREUND,     )
       SHOLOM RUBASHKIN,        )
 7     AGRIPROCESORS, INC.,     )
       AND BRENT BEEBE,         )
 8                              )
                Defendants.     )
 9

10

11

12

13                TELEPHONIC HEARING,

14     held before the Hon. Linda R. Reade on the 9th

15     day of December, 2008, at 4200 C Street S.W.,

16     Cedar Rapids, Iowa, commencing at 9:56 a.m.

17

18

19

20

21

22

23        Patrice A. Murray, CSR, RPR, RMR, FCRR
                United States District Court
24                  4200 C Street S.W.
                 Cedar Rapids, Iowa 52404
25                   (319) 286-2324
```

Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.

2

1        APPEARANCES:

2

3    ATTORNEY PETER E. DEEGAN, JR., Assistant U.S.
     Attorney, Suite 400, 401 First Street S.E.,
4    Cedar Rapids, Iowa 52401, appeared on behalf of
     the United States.
5
     ATTORNEY F. MONTGOMERY BROWN, of the firm of
6    Brown & Scott, 1001 Office Park Road, Suite
     108, West Des Moines, Iowa 50265,
7                    AND
     ATTORNEY GUY R. COOK, of the firm of Grefe &
8    Sidney, 2222 Grand Avenue, P.O. Box 10434,
     Des Moines, Iowa 50306, appeared on behalf of
9    Sholom Rubashkin.

10   ATTORNEY KEVIN J. NASH, of the firm of Finkel,
     Goldstein, Rosenbloom & Nash, 26 Broadway,
11   Suite 711, New York, New York 10004, appeared
     on behalf of Agriprocessors, Inc.
12
     ATTORNEY RAPHAEL M. SCHEETZ, of the Scheetz Law
13   Office, 1921 51st Street N.E., Cedar Rapids,
     Iowa 52402, appeared on behalf of Brent Beebe.
14
     ATTORNEY PAULA LYNN ROBY, of the Elderkin Law
15   Firm, P.O. Box 1968, 115 First Avenue S.E.,
     Cedar Rapids, Iowa 52406-1968, appeared on
16   behalf of the Chapter 11 Trustee.

17

18

19

20

21

22

23

24

25

Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.

### 3

1  THE COURT: The matter before the
2  Court is United States of America versus
3  Freund, et al. This is 08-1324. And let me
4  just go through and make sure that we have
5  everybody.
6      Ms. Roby, are you here for the
7  Chapter 11 trustee?
8      MS. ROBY: Yes, Your Honor.
9      THE COURT: All right. And I know
10  I'm not pronouncing this right, is it Freund?
11  Karina Pilar Freund?
12      MR. DEEGAN: Your Honor, this is Pete
13  Deegan. I believe I saw an e-mail yesterday
14  indicating that Mark Brown, who does represent
15  Ms. Freund, wouldn't be on the call.
16      THE COURT: Right.
17      MR. DEEGAN: Because she's scheduled
18  for a plea.
19      THE COURT: Right. I was just trying
20  to get the pronunciation of her name.
21      MR. DEEGAN: Yes.
22      THE COURT: And that is so.
23  Mr. Brown contacted the Court. Apparently,
24  there has been an agreement reached, and I
25  believe she's set to plead guilty before Judge

### 4

1  Scoles. So Mark won't be with us this morning.
2      For Mr. Rubashkin, Mr. Brown,
3  Montgomery Brown, correct?
4      MR. BROWN: I'm here, Your Honor.
5      THE COURT: And Mr. Cook, I heard you
6  enter your appearance.
7      MR. COOK: Yes, Your Honor, I'm here.
8      THE COURT: And is Mr. Weiss -- he's
9  terminated, right? He's not going to be in
10  this case?
11      MR. BROWN: He did appear for limited
12  purposes for the detention hearing, Judge.
13      THE COURT: Right.
14      MR. BROWN: And I think there's still
15  some question remaining as to whether he'll
16  proceed forward in the case, but he's not with
17  us today.
18      THE COURT: All right. So we just
19  have the dynamic duo of Brown and Cook,
20  correct?
21      MR. BROWN: Yes.
22      THE COURT: All right. Then
23  Agriprocessors, Inc., I'm assuming that Mr. --
24  is Mr. Nash with us?
25      MR. NASH: Yes, I am, Your Honor.

### 5

1  THE COURT: All right. And Mr. -- is
2  it pronounced Beebe, Mr. Scheetz?
3      MR. SCHEETZ: Yes, it is, Your Honor.
4      THE COURT: And Raphael Scheetz is
5  here for Mr. Beebe. And I think that's it,
6  correct?
7      (No response.)
8      THE COURT: All right. Not hearing
9  anything else, I thought it would be a good
10  idea to get together and talk about the trial
11  of this case, because we have a couple of
12  different themes, at least as I read the
13  indictment. And I'm not -- I don't know enough
14  about the case to know, for example, how
15  Mr. Beebe -- how the government feels Mr. Beebe
16  is tied to this case. I don't know anything
17  about him. Was he an employee or is he an
18  employee at Agriprocessors?
19      MR. SCHEETZ: He is an employee and
20  he was an employee.
21      THE COURT: All right. And,
22  Mr. Deegan, can you just outline for the Court,
23  because this is the first time I've had
24  anything to do with this case, just generally
25  what the trial evidence would look like in

### 6

1  terms of length and who the witnesses would be,
2  and so on.
3      MR. DEEGAN: Oh, goodness. It's
4  quite a -- that is quite a task, however, I'll
5  do the best I can, certainly. There is --
6  there's certainly evidence that the government
7  would put on to show that a large number of
8  illegal workers were working at the plant going
9  back for several years, and there is sort of
10  anecdotal evidence along the way regarding the
11  knowledge on the part of, for instance,
12  Defendant Rubashkin, as well as Defendant
13  Beebe.
14      THE COURT: And what was Beebe's
15  position at the plant, or what is his current
16  position?
17      MR. DEEGAN: At the times relevant to
18  the indictment, he was the operations manager
19  and had authority over the beef side of the
20  operations, so he was one of two --
21      THE COURT: Okay.
22      MR. DEEGAN: -- two operations
23  managers at the plant, so he would have been in
24  charge of the entire workforce, along with one
25  other person.

**7**

1   THE COURT:  All right.
2   MR. DEEGAN:  Over the course of,
3   we'll say, perhaps a year or more leading up to
4   May 12 when there was an immigration worksite
5   enforcement action, there is -- the government
6   will put on evidence that employees were being
7   placed on different payrolls, knowing that they
8   were illegal, and being paid in different ways.
9   And that was done with Defendant Rubashkin's
10  involvement, knowledge.
11      In the -- I guess moving forward to
12  the week -- or, let's say, three weeks prior to
13  May 12, there was a scheme to provide new fake
14  identification documents for a large portion of
15  the workforce, again, with Sholom Rubashkin's
16  involvement and assistance.  He was actually
17  the source of about $4,500 that was ultimately
18  distributed down to the employees -- some of
19  the employees in order to finance getting new
20  fake IDs.  That was done through Brent Beebe.
21  It was -- the money basically went from Sholom
22  Rubashkin, to Brent Beebe, to Carlos Guerrero,
23  who is a manager -- or excuse me, a supervisor
24  in the beef department --
25      THE COURT:  I'm sorry --

**8**

1   MR. DEEGAN:  -- for the employees.
2   THE COURT:  -- I didn't catch his
3   name.  Carlos what?
4   MR. DEEGAN:  It's actually Juan
5   Carlos Guerrero-Espinoza.
6   THE COURT:  Okay.
7   MR. DEEGAN:  He's previously pled
8   guilty.
9   THE COURT:  I recognize that name
10  now, yes.
11  MR. DEEGAN:  Yeah.  And then the
12  weekend before the immigration raid, there were
13  a large number of undocumented alien workers,
14  existing employees, that were asked to come in
15  and re-apply under new names using new fake
16  IDs.  And again, as far as these defendants go,
17  both Sholom Rubashkin and Brent Beebe were
18  present in the human resources office the
19  Sunday before the raid assisting these
20  employees in getting new identifications and
21  completing new application paperwork.
22      Moving on to the bank fraud.  Over
23  the course of -- let me just preface this by
24  saying this is an ongoing investigation, and
25  the government does anticipate that there are

**9**

1   going to be additional charges in the future,
2   so I'll speak real generally about the overall
3   scheme.
4       For some extended period of time,
5   prior to October of 2008, there was a scheme by
6   Sholom Rubashkin and others at the plant to
7   essentially take money from accounts
8   receivable, payments that customers were
9   making, diverting those checks for the use of
10  Agriprocessors in other areas before they could
11  be sent to pay down a line of credit at First
12  Bank in St. Louis.  Under the terms of the loan
13  agreement with First Bank, those payments were
14  supposed to be deposited directly into an
15  account for the benefit of First Bank.  The
16  books were caused to show inaccuracies so that
17  it wouldn't be readily detected that the money
18  was being diverted, and there was some steps
19  taken on the part of Defendant Rubashkin and
20  others to then put the money back in a way that
21  made it appear that these were customer
22  payments.  They would break large amounts into
23  smaller amounts and make them odd dollar
24  amounts and then deposit them; run them through
25  other businesses that were controlled by

**10**

1   Agriprocessors or Sholom Rubashkin and then
2   deposit them into this account.  Also -- and so
3   that was in violation of this credit agreement
4   with First Bank, the chief creditor for
5   Agriprocessors.
6       In addition, in the times leading up
7   to the immigration enforcement action in May of
8   2008, there were false certifications submitted
9   under the name of Sholom Rubashkin, under his
10  authority, to the bank stating that the company
11  was in compliance with all the terms of its
12  credit agreement, which included not violating
13  the law in specific ways.
14      In addition, there was -- right after
15  the immigration enforcement action, there was a
16  meeting among Sholom Rubashkin and several
17  representatives of the bank to discuss the
18  problems leading to the immigration enforcement
19  action and the arrest of such a large number of
20  undocumented workers.  Sholom Rubashkin and
21  possibly others made representations to the
22  bankers indicating that they had no knowledge,
23  when the government submits that Sholom
24  Rubashkin did have knowledge that these people
25  were illegal.

11

1  THE COURT:  All right.  What is the
2  involvement, if any, that the government claims
3  Mr. Beebe has with the bank fraud?  Any
4  involvement?
5  MR. DEEGAN:  Regarding the bank
6  fraud?
7  THE COURT:  Yes.
8  MR. DEEGAN:  And again, it's an
9  ongoing investigation, but the bank fraud
10  itself would simply be -- the only connection
11  would be that he was involved with Sholom
12  Rubashkin in getting new documentation for
13  these alien workers, and then Sholom Rubashkin
14  later certified to the bank that the company
15  had no knowledge that they were illegal.  We
16  don't have evidence that Brent Beebe ever made
17  any certifications or statements to the bank
18  that would be fraudulent.
19  THE COURT:  Okay.  Well, that helps
20  me get a little view of what the themes are in
21  this case.  And I know Mr. Brown has stated
22  that he may want to pursue some severance of
23  counts on this case, and so that's why I was
24  asking about Mr. Beebe.
25  I think this case is currently set

12

1  for January 20, 2009, at nine o'clock, and I am
2  certainly available to do the case then.  But
3  as I read not only Mr. Rubashkin's motion for
4  extension of time to file pretrial motions, but
5  also Mr. Scheetz's motion on behalf of
6  Mr. Beebe to continue trial and extend pretrial
7  motions, I thought we should talk about whether
8  January 20 is a realistic date.  It would help
9  me to know, Mr. Deegan, what the state of the
10  discovery file is, approximately how much
11  discovery.  And maybe you could break it into
12  two parts:  First, relating to the bank fraud;
13  and then to the immigration allegations.
14  MR. DEEGAN:  I will certainly attempt
15  to do so.  I don't have the file in front of
16  me, however, my recollection is that on the --
17  first of all, the file is ready and available
18  to be viewed by all the defendants.
19  THE COURT:  All right.  All the grand
20  jury is in there, all of the --
21  MR. DEEGAN:  All the grand jury that
22  is available.  Some of it is still being
23  produced.  I'll just add that I have a short
24  stack of transcripts that I need to review
25  before they actually go in, but that could be

13

1  done later today.  Other than that, it's all in
2  there.
3  THE COURT:  All right.
4  MR. SCHEETZ:  Mr. Deegan, this is Ray
5  Scheetz.
6  MR. DEEGAN:  Yes.
7  MR. SCHEETZ:  When I went through it
8  yesterday, I noticed there were large parts of
9  the grand jury testimony redacted, completely
10  blacked out.
11  MR. DEEGAN:  They're -- Judge, do you
12  want me to talk to Ray Scheetz privately about
13  that, or do you want to --
14  THE COURT:  I guess I'll let you and
15  Ray talk about that privately.
16  MR. DEEGAN:  Okay.
17  THE COURT:  And then if it's an issue
18  that the Court needs to address, then whoever
19  is involved with that particular issue can get
20  me back on the phone at your leisure.
21  MR. DEEGAN:  Okay.  I'll just
22  confirm, there are certain redactions --
23  THE COURT:  All right.
24  MR. DEEGAN:  -- in the file.  Okay.
25  Getting back to the certainly what we'll call

14

1  the immigration side, there are probably a
2  dozen binders of information.  That would
3  include both reports and grand jury
4  transcripts, and then some related materials,
5  exhibits to transcripts, and then some, I'll
6  say, particularly pertinent -- pertinent seized
7  documents.  There is also a large amount of
8  electronic discovery, and this -- this includes
9  really the entire personnel office; probably,
10  oh, a total of ten file cabinets full of
11  materials that were seized and scanned.  Some
12  of that has been actually provided to some of
13  the defendants on disk, and I've talked to
14  Mr. Scheetz about that as well.  But a lot of
15  it just needs to be reviewed on electronic
16  format back at our office.
17  There's also a set of binders,
18  there's about ten of them, just containing
19  I-9s, for the corporation.  These are the
20  immigration forms showing authorization to
21  work, and they're broken into previous -- prior
22  employees and then current employees, or at
23  least current as of the time of the immigration
24  enforcement action.  And those are -- those are
25  pertinent and would take a while to go through

15

1  as well.
2       THE COURT: And that's in addition to
3  the twelve binders of grand jury testimony?
4       MR. DEEGAN: Yes.
5       THE COURT: Okay.
6       MR. DEEGAN: And those have been
7  scanned and those are in electronic format.
8       THE COURT: Which are?
9       MR. DEEGAN: The I-9s.
10      THE COURT: Okay.
11      MR. DEEGAN: Yeah. In addition,
12 there's miscellaneous seized documents that are
13 in electronic form --
14      THE COURT: All right.
15      MR. DEEGAN: -- that, you know, bring
16 the total of electronic discovery -- it's
17 difficult for me to try to quantify it, but
18 we're talking about a large amount of paper
19 that's available for review in electronic form.
20 If it were to be produced in hard copy, we
21 would be looking at, a round number,
22 approximately a hundred banker boxes of paper.
23      THE COURT: Wow, okay.
24      MR. DEEGAN: And again, this is not
25 necessarily -- this isn't stuff that

16

1  necessarily needs to be reviewed in any sort of
2  detail, but that's not for me to decide. It's
3  just simply part of our discovery file and
4  available for defense to review.
5       THE COURT: And as far as how it is
6  put together, are there indexes or --
7  Mr. Scheetz talked about how Ms. Rose had put
8  together the Pharmacom materials for defense
9  counsel. Do we have anything like that to aid
10 defense counsel?
11      MR. DEEGAN: As far as the electronic
12 discovery goes, my understanding is, it is
13 broken out by -- and this would deal primarily
14 with seized items, stuff that was seized during
15 the search. That, I believe, is broken out by
16 area that it was seized from, and in
17 particular, by room. As far as further
18 indexing goes, I guess I can't speak to how,
19 you know -- whether it's searchable or how
20 searchable it is. I believe it is, but I guess
21 I don't want to say that for sure. I know that
22 it's at least broken out by area.
23      With regard to the other items, and
24 this would be grand jury and reports and
25 exhibits, that is broken out in binders.

17

1  And -- and each -- and each binder or set of
2  binders should have an index that, you know,
3  indicates what's in those binders and -- so
4  that whoever is reviewing them can get right to
5  the area that they want to look at. They are
6  all -- it is all part of one discovery file.
7  So, for instance, if Mr. Beebe were looking for
8  information about -- you know, mentioning his
9  name, you know, he'd have to look through a lot
10 of stuff to get to just that; however, he is
11 charged in a conspiracy, of course, and
12 there's -- and that of the co-conspirators as
13 well are important to his case, so it's all
14 part of one big discovery file, I guess is the
15 point that I'd like to make.
16      THE COURT: All right.
17      MR. DEEGAN: Moving then on to the
18 bank fraud, again, we're still gathering quite
19 a bit of evidence. We're probably up to
20 perhaps a binder of reports and grand jury
21 testimony, if I had to guess; and then seized
22 items, probably ten boxes of records.
23      THE COURT: Did you say ten? It kind
24 of cut out there.
25      MR. DEEGAN: Yeah, ten.

18

1       THE COURT: Ten, okay. Thank you.
2       MR. DEEGAN: Yeah.
3       THE COURT: All right. With that in
4  mind -- and is Mr. -- is Mr. Beebe detained
5  also, Mr. Scheetz?
6       MR. SCHEETZ: No, he's not.
7       THE COURT: Okay. So he is out. At
8  this point, Mr. Rubashkin is detained. And I
9  know from the motion list that there are some
10 motions relating to his detention: One before
11 Judge Scoles, a reconsideration; and then an
12 appeal to me, which I am understanding that
13 the -- that Mr. Rubashkin wants me to wait on
14 until Judge Scoles rules on the
15 reconsideration.
16      Is that right, Mr. Brown?
17      MR. BROWN: Yes, Your Honor.
18      THE COURT: So I won't talk to that
19 today. Just in passing, I know Judge Scoles is
20 going to grant the motion to file overlength
21 briefs, so that order should be coming.
22      MR. BROWN: I apologize for not
23 following the rules correctly. I was kind of
24 in a rush yesterday, and I apologize.
25      THE COURT: No problem, Mr. Brown.

### 19

1  I'll tell you, you aren't the only person who
2  hasn't followed those.
3            So talk to me realistically about
4  this.  I know Mr. Scheetz thinks that he needs
5  into the summer; Mr. Deegan thinks that thirty
6  days -- sometime in February.  Doesn't sound
7  like a February trial date to me when I see the
8  discovery -- or hear you talk about discovery,
9  so --
10           MR. DEEGAN:  And, Judge, I don't,
11 quite frankly, know where the February comment
12 came from.  Was that in Scheetz's motion?
13           THE COURT:  Yes.
14           MR. DEEGAN:  Well, let me just say
15 that where we're at now -- I want to add one
16 other thing that I'm sure the Court would be
17 interested in.  And that is that -- because,
18 again, we do have an ongoing investigation
19 here -- we do anticipate -- and I've talked to
20 counsel about this.  We do anticipate adding
21 counts and bringing a superseding indictment.
22 My best guess is that one would be brought in
23 January.  I can't say for certain whether or
24 not an additional one would be brought after
25 that.  However, we're cognizant of the fact

### 20

1  that discovery is perhaps the most important
2  factor in determining whether ultimately the
3  trial date would need to be moved, so we're
4  adding things on a rolling basis as we -- as is
5  appropriate.  And I did want the Court to be
6  aware that I do anticipate at least another --
7  at least one other indictment --
8            THE COURT:  All right.
9            MR. DEEGAN:  -- with substantive
10 changes.
11           THE COURT:  All right.  And is that
12 primarily -- I don't -- I'm not asking you to
13 share something you're not willing to, but can
14 you give me a hint?  Does it relate to the
15 fraud, the bank fraud, or to the immigration
16 issue?
17           (Ms. Roby is disconnected from the
18 telephonic hearing.)
19           THE COURT:  Can you tell me,
20 Mr. Deegan, if it's -- if the superseding is
21 going to relate to the bank fraud or the
22 immigration issues?
23           MR. DEEGAN:  I would anticipate both.
24           THE COURT:  Okay.  All right.  Well,
25 that does help.

### 21

1            MR. DEEGAN:  And then, I guess, back
2  to where the government's at, I believe once we
3  do that, that we'll -- the government would be
4  in a position, perhaps as early as February, to
5  try the case.  And we would like to get it done
6  as soon as, you know, as soon as is
7  appropriate.  But I guess, at the same time,
8  with the discovery, and there are other issues
9  that need to be addressed, and in anticipation
10 of another indictment, the government certainly
11 understands that that may not be realistic
12 either.  So I guess the government would be --
13 our best proposal, if that's the way we want to
14 put it, would be perhaps an April date that --
15           (Ms. Roby is re-joining the
16 telephonic hearing.)
17           MS. ROBY:  I apologize, Your Honor.
18 The technology got the best of me.
19           THE COURT:  All right.  We were just
20 talking, Ms. Roby.  And the government is
21 suggesting, with the superseding indictments
22 that they anticipate, that maybe an April trial
23 date would be realistic, so that's all we were
24 talking about.
25           MS. ROBY:  Thank you, Your Honor.

### 22

1            THE COURT:  Mr. Brown, Mr. Cook -- I
2  kind of know what Mr. Scheetz's position is on
3  this -- what's your thought?
4            MR. COOK:  Judge, this is Guy Cook.
5  I think, given the scope of the discovery and
6  the likely superseding indictment or
7  indictments, that it would probably be more
8  appropriate to look at late summer, early fall,
9  maybe September.  But that's obviously driven
10 by what the superseding indictments look like,
11 or indictment.  But I -- it's hard for me to
12 see this case ready to go to trial before June,
13 even under the current setup.
14           THE COURT:  And, Mr. Brown, do you
15 share that thought?
16           MR. BROWN:  Yes, Your Honor.
17 Mr. Rubashkin is charged with 9,311 state court
18 counts, and that's set for April 20.  That
19 case, I would say, is not as complicated as the
20 federal case, other than that it's calculated
21 that if the judge reads one marshalling
22 instruction per minute, it will take eighteen
23 days to read them all.  We can't be working
24 eight to five and --
25           MR. DEEGAN:  Judge Reade could do it

23

in nine days.
    MR. BROWN:  If so, I'm going to waive my presence for the reading of the instructions.  But having said that, I don't know what the state's position is on staying that.  I've e-mailed Thomas Miller, Jr., about what his position is going to be about that.  You know, I have another trial with Mr. Williams starting January 5.  And I see late summer as the deadline to get this thing done.  And if the government is concerned about some of their witnesses, that they would leave the country, we certainly are amenable to discussing Rule 15 depositions to perpetuate testimony, so we could facilitate that.  That, to me, would be the only extenuating circumstance for not placing this in sometime late summer or early September.
    THE COURT:  Mr. Nash, what's -- what have you been thinking about as we've been talking our way through this?
    MR. NASH:  I'm very new to this, Judge.  I'm the bankruptcy lawyer.
    THE COURT:  Right.
    MR. NASH:  In all likelihood, we will

24

get criminal counsel for the corporation.  I just felt that, under the circumstances, we didn't have anybody available on Friday, so I did take the arraignment.  And, you know, I echo the thoughts of Mr. Cook, and I think we're going to need the time that we're talking about.
    THE COURT:  All right.
    MR. NASH:  And in all likelihood, Judge, we're going to need some time to get counsel in.
    THE COURT:  Yeah.  I would -- I would encourage you to get right on that, because it -- I don't think the issues in this case are too complicated, but it sounds like the discovery is going to take considerable time to go through.
    MR. NASH:  Yes, I got that, Judge.
    THE COURT:  Yeah, all right.
    MR. DEEGAN:  Your Honor, this is Pete Deegan.  While we're on the topic of Agriprocessors and representation, can I raise one issue that the Court might be interested in at this point?
    THE COURT:  Yes.

25

    MR. DEEGAN:  And I'll apologize for -- to Mr. Nash for not, I guess, discussing this with you ahead of time.  But our office has got some concerns about who actually represents the corporation, given the bankruptcy.  And I know that Ms. Roby is on the call here today representing the bankruptcy trustee.  But at this point anyway, has the trustee -- the trustee hasn't hired an attorney to enter an appearance in the criminal case, and I think -- I think it's an open question, at least, as to whether or not it's the bankruptcy trustee that ultimately would have authority to act on behalf of the corporation in this matter.  And with all due respect and gratitude to Mr. Nash for jumping in and trying to move the case along, I think there is a question as to whether or not -- where the authorization to speak on behalf of the corporation comes from as a purely legal matter.  I think Mr. Nash, if I understand correctly, was hired by the owner of Agriprocessors to file the bankruptcy.  And, I guess, beyond that, I don't know that there's been a record as to his authority to speak on

26

behalf of the corporation.  But that may be something that ought to get sorted out sooner rather than later.  And I also -- maybe Ms. Roby can speak to that.  I think perhaps it's still an open question from the bankruptcy trustee's point of view.
    MR. NASH:  Your Honor, can I briefly speak on that before Ms. Roby?  It is an interesting question.  It really is -- it goes to some formalities of the Chapter 11 case.
    THE COURT:  All right.  That would be fine.
    MR. NASH:  I filed a Chapter 11 petition on behalf of Agriprocessors.  Upon the filing of that, they were deemed a debtor in possession at that time.  And upon the filing of the bankruptcy, an estate of Agriprocessors was created under the bankruptcy code.  About two weeks or two and a half weeks into the Chapter 11, we consented to the appointment of an operating trustee in the Chapter 11.  Not a Chapter 7 trustee but an 1104 operating trustee.  And in theory and in substance, the operating trustee now supervises and manages the bankruptcy estate and he is responsible for

27

that.  There is no longer a debtor in possession, because the debtor in possession has been superseded by an actual operating trustee.  However, there is still a debtor, and this is somewhat of a fine, fine point of bankruptcy law.  The debtor is different from the debtor in possession and is different from the bankruptcy estate.  And I've been discussing with the trustee perhaps that he would retain criminal counsel for the -- for the debtor and the estate of Agri.  His view is that he retained counsel at this point to monitor the estate interests, vis-a-vis the criminal proceeding, but is not prepared at this point to file a notice of appearance on behalf of the debtor.  With that, I inherited -- as the existing bankruptcy counsel, although I don't represent the debtor in possession anymore, I was the last one standing, so to speak, and I appeared at the arraignment.  I'm very happy, if we can come to some type of agreement, vis-a-vis the bankruptcy estate, as to, quote, who will represent the -- either -- the Agri interests, whether we call it a debtor in possession or

28

operating trustee or debtor.
     There is a retention application before the Bankruptcy Court of New York to retain a firm to represent the trustee's interest in the criminal proceeding.  They might be different than Agri's interest as a corporation.  And I think the trustee wants to make sure he's not stepping into something he doesn't want to step into.
     So those are technical issues.  I hope to sort them out in the bankruptcy in the next couple of weeks.  And if Your Honor will allow me, I'm going to proceed expeditiously to do that.
     THE COURT:  I appreciate that.
     Ms. Roby, anything that you want to add to what Mr. Nash has told us?
     MS. ROBY:  Yes, Your Honor.  I would echo the fact that this is sort of a finer point in the law and that we're in unchartered territory here.  We've got a Chapter 11 trustee who is managing a corporation.  The corporation has been indicted for wholly pre-petition acts, and his authority and duty to retain counsel to defend those criminal allegations is -- is

29

something we are not having a lot of success researching.  There just isn't a lot of law out there on it.
     We are certainly working expeditiously to make a determination on that point, and the trustee is very anxious to make sure that he is doing everything possible to -- to represent the estate in the best way possible, but that determination hasn't been made.  We anticipate being able to make that determination sometime next week with respect to what we believe his authority is to hire criminal counsel for the defendant corporation.
     In addition, we have the bankruptcy at this point still pending in New York, although there is a venue motion that will be the -- the rest of the hearing will complete on Friday, it's my understanding, and we may be looking at a bankruptcy that's pending here in your district sometime soon.  We're hopeful that that will be the case.
     And so at this point, I hate to come into your court and say "Pay no attention to the gal behind the curtain," but essentially that's what I'm saying.  At this point, the

30

trustee is not assured that he has the ability to retain corporate criminal defense counsel, but he is certainly looking into that and anticipates making a decision quite soon.
     THE COURT:  All right.  Thank you for that update.  As I'm looking at the calendar and thinking about this case -- and I have a huge EEOC case.  I don't know what's going to happen, if it's really going to go to trial, but it's probably an eight-week trial.
     Mr. Deegan, what's your best guess, and just -- I know it's a guess, but is this -- from the government's standpoint, is this a two-week presentation of government evidence or longer?
     MR. DEEGAN:  It could be longer.  I guess my best guess would be maybe a two- to three-week trial.
     THE COURT:  All right.
     MR. DEEGAN:  Yeah, I don't think it's much more than that though.
     THE COURT:  And, Mr. Brown and Mr. Cook, and Mr. Scheetz, I'm not even going to ask you at this point what your thought is because I know you haven't even been able to

31

1  get through all the discovery and haven't
2  thought about what your approach will be to the
3  case. Here's what my -- I'm kind of thinking
4  out loud. I think that we are going to have
5  some challenges, not only in the pretrial
6  motions but we're going to have some challenges
7  in discovery and in picking a jury that has not
8  heard about this case -- well, everybody
9  probably will have heard of the case, but we're
10 looking for jurors, obviously, that haven't
11 formed an opinion. So I'm thinking out loud
12 that maybe if we started with jury selection on
13 the Tuesday after Labor Day, which would be
14 about September 8 -- it might take us several
15 days to pick a jury. We might want to think
16 about a jury questionnaire that we send in
17 advance on the pretrial issues -- or on the
18 issue of pretrial publicity and the like. I
19 was thinking we might get the jury in the box
20 that first week, and then actually start the
21 evidence the next week, which would be Monday,
22 September 14. So you would have to start
23 saving time for this trial on Tuesday,
24 September 8.
25      Do you want to react to that, first,

32

1  Mr. Deegan? I know you may think that's a
2  little longer, but with everything I have
3  heard, I just don't think it's realistic for
4  defense counsel to be ready before then.
5      MR. DEEGAN: Well, Your Honor, I
6  don't want to belabor the point, other than,
7  you know, just to say that the government has a
8  strong interest in getting this case tried and
9  resolved as soon as possible, and I just urge
10 the Court to set it as soon as is possible.
11     THE COURT: All right. And Mr. Cook
12 and Mr. Brown?
13     MR. COOK: Judge, this is Guy Cook.
14 I think the scheduling the Court has discussed
15 is reasonable.
16     THE COURT: All right. And do you
17 agree with that, Mr. Brown?
18     MR. BROWN: Yes, Your Honor. Thank
19 you.
20     THE COURT: And, Mr. Scheetz, I think
21 that's about where you were. You may have been
22 in August in your motion.
23     MR. SCHEETZ: The Court's schedule is
24 fine, Your Honor.
25     THE COURT: All right. Let's plan on

33

1  that. And then I won't have to move it again
2  after the superseding indictment, anticipating
3  that if the grand jury returns it, there will
4  be some additional counts that counsel for the
5  defendants don't know about at this point. I
6  leave open the prospect that this case will be
7  divided into two cases. And I know that
8  Mr. Brown and Mr. Cook intend to file a
9  severance motion, maybe Mr. Scheetz as well.
10 And so I can't tell you because I don't know
11 what I will decide if presented with that
12 motion, but depending on the outcome of any
13 motion practice, obviously, that may have to be
14 switched around a little bit. Sorry to be
15 vague, but I don't know what the outcome of
16 those motions will be obviously. And it looks
17 like Mr. Brown and Mr. Cook are thinking about
18 a motion for change of venue or district and
19 some other motions. The motion for recusal
20 that's mentioned here, Mr. Brown and Mr. Cook,
21 if you're going to file that, it might be wise
22 to do that as one of your first moves, if
23 you're serious about it --
24     MR. COOK: Yes, I understand, Judge.
25     THE COURT: -- so that I know if I am

34

1  going to be your judge or not, because I'm
2  making some decisions here that another judge
3  may not agree with.
4      MR. DEEGAN: And, Your Honor -- this
5  is Pete Deegan again.
6      THE COURT: Yes.
7      MR. DEEGAN: My -- just by way of
8  suggestion --
9      THE COURT: Yes.
10     MR. DEEGAN: -- I wonder if the Court
11 would consider sort of a -- a graduated
12 pretrial motions schedule, one where it would
13 obviously leave open the possibility of a
14 severance of counts down the road, but perhaps,
15 we could set a deadline for the other motions
16 so that we get it done at the front end of the
17 case rather than later, just on the assumption
18 that that could change things going forward and
19 even resolve some.
20     THE COURT: All right. I think that
21 that's a really good suggestion. And it looked
22 like that, in Mr. Brown's motion, that that's
23 kind of what he was thinking about too. So, as
24 I understood the motion of Mr. Brown, the
25 change of venue and district and motion for

### 35

recusal were the ones that you had sorted out as the first ones that you wanted to take a look at.

Is that fair, Mr. Brown?

MR. BROWN: Yes, Your Honor.

THE COURT: All right. And would it be possible for you to file any motions on venue, district, recusal, or severance by January sometime, January 15? Or is that pressing you?

MR. BROWN: Well, Assistant US Attorney "Wolverine" C.J. Williams has me tied up for thirteen days with Judge Bennett starting January 5. How about January 30?

THE COURT: Okay.

MR. BROWN: I'll get it done as soon as I get back.

THE COURT: And, Mr. Scheetz, obviously, I didn't mean to suggest that you may not want to file similar motions, but if we set January 13 [sic] for those initial venue, district, recusal motions, would that be acceptable to you?

MR. SCHEETZ: January 30?

THE COURT: Yes.

### 36

MR. SCHEETZ: Yes.

THE COURT: All right. And then you had a potential grand jury misconduct, Mr. Brown. Do you see that in that same group of motions, or do you see that as some other issue, separate?

MR. BROWN: I think that's something that can be addressed pretty promptly upon review of the grand jury transcripts. We are collecting our own anecdotal versions of what happened in the grand jury, but this redaction issue is -- I'm wondering if the things that I'm concerned about have been redacted, but I think that could be addressed by the 30th of January.

THE COURT: Okay. And is -- Mr. Scheetz, is that acceptable to you as well?

MR. SCHEETZ: I don't know -- I don't know if Mr. Brown appreciates how much grand jury materials there are. It would take a lengthy amount of time. That's a really, really -- there's several thousand pages of grand jury testimony. I would suggest something a little bit later than next month.

MR. DEEGAN: Your Honor, this is Pete

### 37

Deegan. I had some e-mail exchanges with Mr. Brown and have some understanding of his theory on grand jury misconduct. And let me just add that I'll do whatever I can to guide him to the particular transcripts that he seems to -- or the witnesses that he may have an issue with so that he can check the transcripts to see whether or not what he's heard otherwise -- whether it checks out or not.

THE COURT: Okay.

MR. DEEGAN: And I guess that would be one way that we could get this done in time for a January 30 deadline.

THE COURT: Let's try for January 30, but if that crowds you, I think we could go another two or three weeks on that on the grand jury issue. And then I would like to address as soon as possible any severance issues. Do you think we could do -- let's see, do you think we could do that by the end of February?

MR. BROWN: Subject to a superseding indictment that has more alleged financial crimes, Your Honor --

THE COURT: Okay.

MR. BROWN: -- I could do it right --

### 38

I could do it fairly quickly on what's alleged in Counts 11 and 12 right now; but if there's more financial crimes, we're going to take a look at it every time they add a new one.

THE COURT: Okay. Well, let's try for the end of February. And I understand if that isn't possible, and you can agree among yourselves that that date needs to be slid back or you can involve me in it and just let me know when you want to have a hearing on it.

All right. And then we have our usual pretrial order that sets the motions in limine and the status conference. In some of these more complicated cases, it really makes more sense for me to carry the motions and everything relating to the case and not involve the magistrate judge because then you have two judges that have to be up to speed. And I need to get up to speed on this case because, frankly, I don't know and haven't read the file on this. I've looked at the indictment very briefly. But I wonder if this wouldn't make sense, for me to just handle all the motions from this point forward.

What's your thought on that,

**39**

 1  Mr. Deegan?
 2          MR. DEEGAN:  I think that's a good
 3  idea, Your Honor.
 4          THE COURT:  All right.
 5          MR. COOK:  Judge -- this is Guy
 6  Cook -- I agree.
 7          THE COURT:  And Mr. Brown?
 8          MR. BROWN:  That's fine, Your Honor.
 9  Thank you.
10          THE COURT:  And Mr. Scheetz, I think
11  we did that in Pharmacom, and I thought it
12  worked pretty well.  Didn't you think so?
13          MR. SCHEETZ:  Yeah, I thought it
14  worked very well.
15          THE COURT:  All right.  Then I can
16  stay on top of what the struggles are in
17  discovery and try to work with you on that.
18          All right.  We've covered a lot of
19  ground.  What else should we be talking about
20  at this stage?
21          MR. DEEGAN:  Your Honor, this is Pete
22  Deegan again.  On the issue of pretrial
23  motions, it sounds like what the Court's
24  contemplating has all of the motions sort of in
25  mind.  I guess I might suggest, just so that we

**40**

 1  make sure that there's some sort of deadline
 2  that would be a catchall, that, you know,
 3  perhaps with the exception of severance motions
 4  or other motions attacking the indictment,
 5  which might be appropriately brought prior to
 6  the end of February, that perhaps the end of
 7  January be sort of a catchall deadline for any
 8  other pretrial motions, except motions in
 9  limine, obviously, and that sort of thing.
10          THE COURT:  Right.  I would like to
11  aim for that, but I am reluctant to ask the
12  attorneys to make an absolute commitment to
13  that at this point, because there's too much
14  unknown about the contents of any possible
15  superseding.  Let me suggest that we set
16  January 30 at this point.  And as I have done
17  in some of these other more complicated
18  criminal cases, every month or six weeks I get
19  the lawyers on the phone, we see how we're
20  doing, resolve any issues, and at that point I
21  may be able to give a more solid date.  Does
22  that make sense?
23          MR. SCHEETZ:  Your Honor, this is Ray
24  Scheetz.  In my written motion, I suggested an
25  April 1 date, and I did that knowing the volume

**41**

 1  of the discovery.  And so with all due respect
 2  to Mr. Deegan, I think the catchall date for
 3  January 30 is too optimistic.  But, you know,
 4  I'll certainly do everything I can to get these
 5  filed as soon as possible.
 6          THE COURT:  All right.  And Mr. Brown
 7  and Mr. Cook, what's your thought?
 8          MR. COOK:  I think the Court's
 9  approach is reasonable.
10          THE COURT:  All right.  Mr. Brown --
11          MR. COOK:  I also know the Court's
12  willing to look at other exigencies that might
13  come up and expand that deadline.
14          THE COURT:  All right.  I really
15  think that this is what we'll start with.  And
16  we'll start getting to work, and then the
17  lawyers will see what they're up against in
18  terms of discovery and what the issues are
19  going to be.  And I'll periodically set a
20  telephone conference call where you can all
21  participate and tell me how things are going.
22          My contact in chambers is
23  Mr. Vavricek, my law clerk.  And he will be the
24  law clerk working on this case with me.
25  Hopefully, by May or so, we will have a

**42**

 1  courtroom that could even accommodate this
 2  trial.  We're very hopeful that we'll be --
 3  we'll be moving from one warehouse to another,
 4  but we'll have a courtroom that looks like a
 5  federal courtroom.  So we'll just work this
 6  through.
 7          Let me know in the interim before the
 8  next status conference if there are things that
 9  you think I can help you with.  You can call
10  Mr. Vavricek or call me, and we'll set up a
11  conference call and talk about it.  I think it
12  makes sense to do these by telephone conference
13  call because we're out here at 4200, and it's a
14  struggle for anybody to get out here,
15  especially on icy roads.  But I'm willing to do
16  it in person, if you think that is more
17  advantageous.  I just hate to have the
18  Des Moines lawyers have to travel over here for
19  a twenty-minute conversation, so we'll work
20  through that.
21          I'll get out a preliminary order.
22  Please save beginning September 8 for trial,
23  and we'll capture these other deadlines in that
24  preliminary order, with the understanding that
25  we may have to be a little more flexible due to

43

1  the amount of discovery and the issues that are
2  likely to be raised.
3          All right.  Anything else that I can
4  do today?
5          MR. NASH:  No, Your Honor.
6          MR. DEEGAN:  No, Your Honor.
7          MR. SCHEETZ:  No, Your Honor.
8          MR. BROWN:  No, thank you, Your
9  Honor.
10         MS. ROBY:  No, thank you, Your Honor.
11         THE COURT:  Okay.  Have a great day,
12 drive safe, and we'll be in touch with you in
13 about four to six weeks, if not before.
14         (Proceedings concluded at 10:46 a.m.)

44

1           C E R T I F I C A T E

2      I, Patrice A. Murray, a Certified
   Shorthand Reporter of the State of Iowa, do
3  hereby certify that at the time and place
   heretofore indicated, a hearing was held before
4  the Honorable Linda R. Reade; that I reported
   in shorthand the proceedings of said hearing,
5  reduced the same to print by means of
   computer-assisted transcription under my
6  direction and supervision, and that the
   foregoing transcript is a true record of all
7  proceedings had on the taking of said hearing
   at the above time and place.
8
9      I further certify that I am not related
   to or employed by any of the parties to this
10 action, and further, that I am not a relative
   or employee of any attorney or counsel employed
11 by the parties hereto or financially interested
   in the action.
12
           IN WITNESS WHEREOF, I have set my
13 hand this 5th day of January, 2009.

14
   _____
15 Patrice A. Murray, CSR, RPR, RMR, FCRR
   United States District Court, NDIA
16 4200 C Street S.W.
   Cedar Rapids, Iowa 52404